# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

HERMAN JEROME HARDEN,            )
                                )
            Plaintiff,           )            Case No. 3:03-1164
                                )            Judge Trauger
v.                               )
                                )
CSX TRANSPORTATION, INC.,         )
                                )
            Defendant.           )


## MEMORANDUM

Pending before the court is the Motion for Summary Judgment of defendant CSX

Transportation, Inc. (Docket No. 31), to which plaintiff Herman Jerome Harden has responded

(Docket No. 38), and defendant has replied (Docket No. 42).


## I.        Factual Background and Procedural History

Defendant CSX Transportation, Inc. ["CSXT"] is a railroad carrier that has a Nashville

Division.  (Docket No. 34, Merrell Affidavit at ¶ 2)  The plaintiff, Herman Jerome Harden, is an

African American and a resident of Tennessee.  (Docket No. 1, Complaint at ¶ 7)

Plaintiff began working for the defendant in January of 1978. (Docket No. 31, Harden

Depos. at p. 11)  He was hired as a trainman and was later promoted to conductor.  *Id.*

In 1995, the plaintiff was dismissed from service as a result of a train derailment, but he

was reinstated through the appeals process in January of 1997, after twenty-five months.  *Id*. at p.

18.  During this period of unemployment, the plaintiff applied for a job with Southwest Airlines

["Southwest"].  *Id.*  Southwest did not hire him until April of 1997, after he had already been

reinstated at CSXT.  *Id.*  At Southwest, the plaintiff worked as a ramp agent, primarily loading and unloading planes, until he was promoted to an operations agent in November of 2002.  *Id*. at p. 29.

From April of 1997 until July 19, 2002, the date of plaintiff's termination, the plaintiff worked as a full-time employee for both CSXT and Southwest.  *Id*. at p. 78.  Each job allowed for two rest days per week, leaving three overlapping days when the Plaintiff would work double shifts or "give days away" to other employees at Southwest.  *Id*. at p. 79.  He would also, on occasion, pay other Southwest employees to take his shift.  *Id*.  The defendant terminated the plaintiff in July of 2002, allegedly for problems with excessive absenteeism.

CSXT has a five-step Progressive Policy for dealing with "Attendance Incidents including missing work without permission, frequent layoffs, missed calls, etc."[1]  (Docket No. 31, Harden Depos., Exhibit 5, CSXT Employee Policy Guidelines)  Each of the five steps has a corresponding disciplinary action:

> **First Step:** Informal Coaching and Counseling. Local Chairman is welcome to attend.
> **Second Step:** Formal Coaching and Counseling, confirmed by a letter to the employee. Local Chairman is welcome to attend.
> **Third Step:** Formal hearing under the provisions of the collective bargaining agreement, and if found at fault, up to 10 days actual suspension. Employee may waive investigation if desired.

---

[1] According to the plaintiff, there are several types of work days and several types of absences at CSXT.  An employee at CSXT could be scheduled for a work day, a rest day, a displaced day or be on call.  (Docket No. 31, Plaintiff Dep. at pp. 104-06)  An employee "on call" must wait at an appointed place for a call if that employee is needed.  *Id*. at pp. 23-24.  If the employee is going to be somewhere different, he or she is required to notify someone and give the phone number where he or she can be reached.  (Docket No. 31, at Exhibit 4)  When an employee is on call and cannot be reached, he receives a "missed call."  (Docket No. 31, Plaintiff Dep. at p. 106)  CSTX employees can bid for different jobs, and they can also "displace" other employees from jobs using their seniority status.  *Id*. at pp. 104-05.  This is called "rolling somebody."  *Id*. at p. 104.  The employee who is rolled goes into "displaced" status, at which point that employee has five days before he has to "roll" someone else for a job.  *Id*. at p. 105.  The time on "displaced" status is not paid.  *Id*.  Employees at CSXT are also required to take a certain number of rest days.  *Id*.  Finally, an employee can "lay off" a day by calling in sick, using personal days, or using vacation days.  *Id*.

**Fourth Step:** Formal hearing under the provisions of the collective bargaining agreement, and if found at fault, up to 30 days actual suspension. Employee may waive investigation if desired.

**Fifth Step:** Formal hearing under the provisions of the collective bargaining agreement, and if found at fault, up to dismissal.

(Docket No. 39, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts at ¶ 6)  The CSXT Employee Performance Policy states that, when an employee reaches the last step of the Progressive Policy and then is found guilty of another offense, the "discipline administered should be dismissal."  (Docket No. 41 at p. 19)[2]

Separate from, but related to, the CSXT policy concerning attendance issues is CSXT Operating Rule 500. (Docket No. 39, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts at ¶ 4) That rule states:

Employees must report for duty at the designated time and place.  Without permission from their immediate supervisor employees must not:

1.  Absent themselves from duty, or
2.  Arrange for a substitute to perform their duties.

Employees subject to call for duty must be at their usual calling place or furnish information as to where they must be located. When they wish to be absent or if they are unable to perform service, employees must notify the proper authority. They must not wait until a call for duty is received to request permission to be marked off.

Employees must give immediate written notice to their supervising officer of a change in their address or their telephone number. Employees must call for their mail regularly and must answer correspondence promptly.

Employees must not engage in any other type of work or business:

1.  That interferes with their proper rest or performance of their railroad duties,
2.  That is detrimental to or in competition with the Company, or

---

[2] Because the plaintiff filed Docket No. 41 without page numbers or any other method of reference, the court has numbered the pages, beginning with the first page of the Notice and proceeding through the documents attached to the Notice. Page references herein to Docket No. 41 correspond to the court-affixed numbers.

3. During their tour of duty or on Company property without permission from proper authority.

*Id.*

Defendant's employment policies do not prohibit employees from having another job. (Docket No. 41, CSXT's Responses to Plaintiff's Interrogatories at ¶ 10)  The plaintiff testified that he was told that, "they didn't care about me working at Southwest and that … they were glad that I was able to work both places."  (Docket No. 31, Harden Depos. at p. 53)

The plaintiff's history of discipline for absentee problems began in 1999.  He was first disciplined for "excessive absenteeism" on July 7, 1999, and again on December 17, 1999; both times he received Level 1 informal coaching and counseling.  (Docket No. 34, Merrell Affidavit at ¶ 4)  On April 26, 2000, he failed to show up at a regularly assigned job and later called in, saying he had turned off his alarm and overslept.[3]  (Docket No. 31, Harden Depos., Exhibit 6, Formal Coaching and Counseling Form)  On May 3, 2000, the plaintiff graduated to the second step of the Attendance Policy for continued attendance problems, and he received formal coaching and counseling.  (Docket No. 34, Merrell Affidavit at ¶ 5)

In October of 2000, the plaintiff was injured in a motor vehicle accident.  (Docket No. 31, Harden Depos., Exhibit 3, Middle Tennessee Medical Center Physical Therapy)  Dr. George Smith treated him for neck and lower back pain and recommended physical therapy as well as a lightened work load.  *Id.*  It was around this time that Southwest promoted the plaintiff to operations agent.  (Docket No. 31, Plaintiff Dep. at p. 29)

On January 22, 2001, CSXT gave the plaintiff a formal hearing, in accordance with Level 3 of the Attendance Policy.  (Docket No. 34, Merrell Affidavit at ¶ 6)  The hearing resulted in the

---

[3] The plaintiff testified that, after the year 2000, he never missed a call and was never disciplined for missing a call. (Docket No. 31, Harden Depos. at p. 106)

plaintiff's receipt of a ten-day suspension, which he appealed to the Public Law Board ["PLB"].
*Id*. The PLB found that the plaintiff had "laid off" 46 days during the 90-day period of October
15, 2000, to January 15, 2001. (Docket No. 31, Harden Depos.,Exhibit 7, Public Law Board No.
6398) During this time, the plaintiff was certified for intermittent absences under the Family
and Medical Leave Act, but he had not designated days for that purpose during the 90-day period
in question. *Id*. During the hearing, the plaintiff admitted to maintaining a second job. *Id*.

The plaintiff reached Level 4 of the Attendance Policy later that year. On June 14, 2001,
CSXT held a formal hearing regarding the plaintiff's alleged excessive absenteeism from
February 22, 2001, to May 25, 2001. (Docket No. 31, Harden Depos., Exhibit 8, Letter
7/9/2001) He was suspended for thirty days as a result of that hearing. *Id*. The plaintiff
appealed the suspension to the PLB, but the PLB again upheld his suspension. (Docket No. 34,
Exhibit A, Public Law Board No. 5983) The PLB found that the plaintiff "laid off for illness,
family illness and for personal business 23% of the time" and also held that the fact that he
"marked off with the callers does not alleviate or mitigate the excessive absenteeism." *Id*.

Defendant sent plaintiff a letter dated April 5, 2002, charging him with excessive
absenteeism for the period of January 4, 2002, to April 4, 2002.[4] (Docket No. 31, Harden
Depos., Exhibit 9, Special Board of Adjustment No. 955) The defendant held a formal hearing
pursuant to disciplinary Level Five on April 9, 2002; however, the plaintiff did not appear. *Id*.
Over the objection of the union, the defendant carried out the hearing without the plaintiff
present and made the decision to terminate him. *Id*. The plaintiff and the union appealed the
decision to CSXT management, alleging insufficient notice. *Id*. As a result, in a letter dated

---

[4] The plaintiff requested "irregular and intermittent" Family and Medical Leave Act leave from March 21, 2002, to
March 20, 2003, for arthritis in his left big toe and for his chronic back problem. (Docket No. 31, Harden Depos. at
p. 98; Docket No. 41, Discovery Excerpt at p 51) The leave was approved on April 18, 2002, after the first formal
hearing on his charge of Level 5 excessive absenteeism. *Id*.

April 19, 2002, the defendant voided the investigation, rescinded the termination, and removed the investigation from the plaintiff's record. *Id.*

On May 6, 2002, CSXT charged the plaintiff with excessive absenteeism for the period from January 19, 2002 until May 6, 2002. (Docket No. 39, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts at ¶ 7) The formal hearing was postponed a number of times but was finally held on June 25, 2002.[5] (Docket No. 31, Harden Depos., Exhibit 9, Special Board of Adjustment No. 955)

On July 19, 2002, the defendant sent plaintiff a letter dismissing him from service. (Docket No. 41 at p. 15) The letter states that the "investigation clearly developed that you were absent from work excessively during the period stated above. CSX has every right to expect its employees to work regularly and you have failed to do this." *Id.*

The plaintiff appealed the termination. (Docket No. 39, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts at ¶ 9) On appeal, the Board changed Plaintiff's termination to a "very lengthy disciplinary suspension." *Id.* The Board decided that, after the plaintiff had completed certain enumerated requirements, the plaintiff would receive:

> "*one last chance*" to demonstrate that his vocational preference is exclusively with the carrier; that he will immediately adjust his health care habits; that he will discontinue his manipulation of seniority preferences and devote his entire energy and efforts towards fulfilling his primary (job) responsibilities with CSX.

*Id.* (emphasis in original) After this decision was issued, the defendant told the plaintiff that he had to quit his job with Southwest in order to be reinstated. (Docket 31, Harden Depos. at p. 87)

---

[5] The plaintiff was injured at CSXT on May 8, 2002, when he moved a drawbar. (Docket No. 31, Harden Depos. at p. 81) This was his last day of work with the defendant because, by the time he was released to go back to work, CSXT had placed him on administrative leave in preparation for his dismissal. *Id.*

However, the plaintiff testified that, "after he got the union involved," the CSXT management stated that he did not have to leave Southwest.[6]  *Id.* at p. 88.

The plaintiff filed a claim on January 9, 2003, with the Tennessee Human Rights Commission and the EEOC, alleging that he had been terminated in July 2002 because of his race.  (Docket No. 1, Complaint at ¶ 3)  Plaintiff received a right-to-sue letter on September 10, 2003.  *Id.*  The plaintiff filed suit in this court on December 5, 2003, asserting claims of racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*  The plaintiff claims that Steve Herald, a white employee who also reached Level 5 of the Progressive Disciplinary Policy, was treated more favorably than he was because, though Herald was also found guilty of excessive absenteeism and a Rule 500 violation, instead of being terminated, Herald was only suspended.  (Docket No. 38, Plaintiff's Memorandum in Opposition to Summary Judgment)

Steve Herald has worked for the defendant's Nashville Division of CSXT's transportation department as a trainman since April of 1977.  (Docket No. 41 at pp. 21, 26)  According to his Personnel Data Summary, Herald was first disciplined for an attendance issue on May 15, 1979, when he received a reprimand letter because he was not available for call.  *Id.* at p. 21.  He received various discipline letters over the next 15 years for reasons including leaving on call without proper notification, missing a call for work, and problems with work habits.  *Id.*  He was suspended once in 1985 for failure to inspect his train and once in 1992 for failure to protect his assignment.  *Id.*  In 1993-1994, Herald received one warning letter for marking off and three warning letters for violating Rule 500.  *Id.*

---

[6] In order to be reinstated, however, the plaintiff had to take a rules test and skills seminar, complete training, take a physical and submit to a drug test.  (Docket No. 31, Harden Depos. at p. 87)  The plaintiff complied and was reinstated to CSXT on April 1, 2004.  *Id.* at p. 89.

7

On July 25, 1997, Herald received a formal hearing for a charge of "having attendance below standards for the period of May 3, 1997 through June 13, 1997." *Id*. at p. 22  After Herald was found guilty, CSXT gave him a ten-day suspension. *Id*.  The PLB set that suspension aside, however, since Herald had not been timely notified. *Id*.  On December 2, 1997, CSXT suspended Herald for thirty days after an investigation into his "excessive absenteeism" for the period of September 20, 1997, through October 31, 1997. *Id*. at p. 23. In a December 5 letter, CSXT declared the investigation null and void and rescinded the suspension, because a mechanical malfunction prevented the tape of the hearing from being authenticated. *Id*.

On February 24, 1998, the defendant held another investigation into Herald's excessive absenteeism for the period from December 1, 1997, to January 31, 1999. *Id*. at p. 26.  The defendant suspended him for thirty days because of his absenteeism and violation of Rule 500. *Id*.  Herald appealed this decision to the Public Law Board, which upheld the company's decision. *Id*.  The PLB found that, during the sixty-day period, Herald had worked only nineteen of his forty-five assigned days. *Id*. at p. 27.  The PLB found that "the record shows that [Herald] had also been suspended from service for missing calls, marking off excessively, and failures to protect his assignment. It thus appears that [Herald] fails to recognize that he is obliged to work with a high degree of regularity." *Id*. at p. 28.

On February 4, 2000, Herald was suspended for thirty days for excessive absenteeism and violating Rule 500 during the period of August 1, 1999 and November 11, 1999. *Id*. at p. 29. Herald appealed, but the Public Law Board upheld the decision. *Id*. at p. 37.  During the 103-day period at issue Herald marked off nineteen days – eight days for personal sickness, nine days for sickness in his family, and two days for personal business. *Id*. at p. 29 n.1.  The PLB determined that Herald's absence ratio was between 24.6% and 25%. *Id*. at p. 29.  Although there is no

policy as to what constitutes "excessive absenteeism," a CSXT General Manager stated, "*Twenty percent absenteeism is used as a yardstick on the Nashville Division*." *Id*. at p. 32. (emphasis in original) The PLB held that Herald's rate of absenteeism,

> when taken in conjunction with [Herald's] egregiously deplorable disciplinary record, supports [CSXT's] position that the discipline assessed was not only warranted but extremely lenient. Had [CSXT] followed the Employee Performance Policy guidelines in the case, then [Herald's] employment with [CSXT] would have been terminated. Instead, [CSXT] chose to exercise leniency in a last ditch attempt to salvage a long time employee. However, let there be no doubt, if [Herald's] attendance does not improve dismissal will surely follow."

*Id*. at p. 27. The PLB noted that termination of employment had been warranted in accordance with CSXT's Disciplinary Policy the last time Herald had brought an appeal to it. *Id*. at p. 34. Yet, once again, Herald was only given a thirty-day suspension. *Id*. On July 17, 2000, a supervisor agreed to settle for a ten-day actual suspension - a twenty-day reduction from the originally issued suspension. *Id*. at p. 25.

On May 29, 2002, Herald was given a fifteen-day suspension for excessive absenteeism. *Id*. at p. 21. On March 11, 2003, he received a letter of reprimand about his excessive absenteeism that noted that, because he was qualified for the Family and Medical Leave Act, he had "been off for medical reasons more than the record may indicate due to being off on rest days, vacation and personal leave days in lieu of being off on FMLA." *Id*. at p. 38. The letter states that, although Herald's work was not good, "it is not felt that suspension would be beneficial at this time." *Id*. Approximately one year later, on March 22, 2004, Herald was dismissed for absenteeism problems. *Id*. at p. 21.

On July 9, 2004, the defendant filed its first motion for summary judgment (Docket No. 16), which this court denied on February 1, 2005[7] (Docket No. 35). The defendant filed the pending motion for summary judgment on January 31, 2005, asserting that the plaintiff cannot prove his *prima facie* case of discrimination and that the defendant had legitimate, nondiscriminatory reasons for terminating the plaintiff. (Docket Nos. 31, 32)

II.     **Analysis**

A.     **Standard of Review**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the court must view the factual evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). If the

---

[7] The defendant requested summary judgment based on the fact that the plaintiff had not made this case known to the Bankruptcy Trustee. (Docket No. 35) Because the plaintiff subsequently cured this problem, this court denied the defendant's motion for summary judgment. *Id.*

nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537–38 (6th Cir. 1999).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon*, 107 F.3d 1171, 1174–75 (6th Cir. 1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. *Id*. at 255.

The court should also consider whether the evidence presents "a significant disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52). "There is no genuine issue for trial unless the nonmoving party has produced enough evidence for a jury to be able to return a verdict for that party." *Tinsley v. General Motors Corp.*, 227 F.3d 700, 703 (6th Cir. 2000). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–52. "A genuine dispute between the

parties on an issue of material fact must render summary judgment inappropriate." *Hill v. White*,

190 F.3d 427, 430 (6th Cir. 1999) (citations omitted).


B.      ***Prima Facie* Case of Title VII Race Discrimination**

The plaintiff claims that, in violation of Title VII, he was given harsher punishment

because of his race and that white employees who had reached the higher levels of the

Attendance Policy were treated with more leniency. (Docket No. 1, Complaint ¶¶ 15, 16; Docket

No. 31, Harden Depos. at p. 40)

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "(1) . . . to

discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions or privileges of employment, because of such individual's

race." 42 U.S.C. § 2000e-2(a). A plaintiff may make out a claim of Title VII disparate treatment

on the basis of race by presenting direct evidence of discrimination or, as in this case, by using

circumstantial evidence to create an inference of discrimination. *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802 (1973).

To prove a case of discrimination under the *McDonnell Douglas* framework a plaintiff

must first make out the *prima facie* case by producing evidence that: (1) he is a member of a

protected class; (2) he was subject to an adverse employment decision; (3) he was qualified for

the position; and (4) he was either replaced by a person outside of the protected class or a

similarly-situated, non-protected employee was treated more favorably than he was. *Clayton v.*

*Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002); *see also McDonnell Douglas*, 411 U.S. at 802.

The United States Supreme Court has held that the "burden of establishing a prima facie case of

disparate treatment is not onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248,

253 (1981); *see also Peters v. Lincoln Elect. Co.*, 285 F.3d 456, 473 (6th Cir. 2002) ("As the District Court noted, the plaintiff's burden at "step one" is relatively light under the *McDonnell Douglas / Burdine* paradigm."). Once the plaintiff has established the prima facie case, the defendant has the burden of producing some legitimate, nondiscriminatory reason for the action. *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir. 1997). Then it is the plaintiff's burden to show that the proffered reason was pretextual. *Manzer v. Diamond Shamrock Chemicals*, 29 F.3d 1078, 1084 (6th Cir. 1994).

The defendant concedes the first three elements of the *prima facie* case for the purposes of summary judgment. (Docket No. 32, CSXT's Memorandum Supporting its Motion for Summary Judgment at 11) However, the defendant contends that the plaintiff has failed to establish a *prima facie* case of race discrimination, because there is no evidence that the plaintiff was treated less favorably than similarly situated employees outside of his protected class. (Docket No. 32, CSXT's Memorandum in Support of its Motion for Summary Judgment at 11)

The defendant first asserts that the plaintiff cannot prove the fourth prong of the *prima facie* case because there were four other white employees fired in 2002 for less severe absenteeism problems. (Docket No. 32, CSXT's Memorandum Supporting its Motion for Summary Judgment at p. 14) Establishing a *prima facie* case, however, requires only that, "*a* similarly situated employee received disparate treatment for the same conduct." *Weigel* 302 F.3d 367, 368 (6th Cir. 2002) (emphasis added); *see also Ercegovich v. Goodyear Tire & Rubber Co*. 154 F.3d 344, 2350 (6th Cir. 1998) ("[H]e failed to present evidence sufficient to satisfy the fourth element because he did not identify *one or more* similarly-situated employees.") (emphasis added).[8] Thus, for purposes of the prima facie case, a plaintiff is only required to

_____

[8] The court also notes that defendant does not present any evidence about these other employees other than that they were terminated for "absentee problems" and that no other employees at the Nashville Division of CSXT "had

present evidence that one other similarly situated, non-protected employee received more favorable treatment.

The plaintiff specifically points to Steve Herald as a similarly situated white employee who was treated more favorably than he was. (Docket No. 31, Harden Depos. at pp. 49-50) The plaintiff asserts that Herald had the same supervisors, the same position, within the same division, was subject to the same Disciplinary Policy, was at the same, final level of that Disciplinary Policy and had the same guilty finding. Yet, while the plaintiff was terminated, Herald was not. (Docket No. 38, Plaintiff's Memorandum in Opposition to Summary Judgment)

The defendant counters that Steve Herald is not similarly situated to the plaintiff because: (1) his attendance record was not as bad as the plaintiff's; (2) he did not maintain employment outside of the railroad; (3) he did not abuse the FMLA by taking FMLA leave from the defendant to work for another employer; and (4) he did not suffer injuries at a second job that caused him to miss work for the defendant. (Docket No. 42, CSXT's Reply to Plaintiff's Memorandum in Opposition to the Motion for Summary Judgment at p. 3)

In *Mitchell v. Toledo Hospital*, the Sixth Circuit stated that "the plaintiff must show that the 'comparables' are similarly situated in all respects." 964 F.2d 577, 583 (6th Cir. 1992). The employees "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id*. The Court also noted that the employees should hold jobs that are at least comparable positions. *Id*. at 583 n.5.

---

attendance problems comparable to Plaintiff's during the time relevant to this lawsuit." (Docket No. 34, Merrell Affidavit at ¶¶ 12, 19)

The Sixth Circuit further clarified the *Mitchell* standard in *Ercegovich v. Goodyear Tire & Rubber Co.* 154 F.3d 344 (6th Cir. 1998). The Court explained that a plaintiff is only "required to prove that all of the *relevant* aspects of his employment situation were 'nearly identical' to those of [the non-minority's] employment situation." *Id.* at 352. (emphasis in original). The Court noted that a plaintiff does not have to demonstrate an "exact correlation" between himself and the other employee but need only demonstrate that they are similar as to all the relevant factors. *Id.* The Court further explained that, in *Mitchell*, the Sixth Circuit relied on factors that were relevant to that case's particular factual context and that courts should not assume that those factors will be relevant in cases involving different circumstances. *Id.* To determine what factors are "relevant," the *Ercegovich* Court held that courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employee status and that of the non-protected employee." *Id.* However, the Court also stated that, because the *Mitchell* factors arose out of "an allegedly discriminatory disciplinary action resulting in the termination of the plaintiff's employment," the factors stated in *Mitchell* "generally are all relevant considerations in cases alleging differential disciplinary action." *Id*; *see also Martin v. U.S. Playing Card Co.*, No. 97-3391, 1998 WL 869970, at * 3 (6th Cir. Dec. 4, 1998) (noting that the *Ercegovich* court found the *Mitchell* factors to be relevant in cases alleging differential disciplinary action). Here, the plaintiff alleges that he was subject to a differential and discriminatory disciplinary action that resulted in his termination. The court therefore finds that the factors laid out in *Mitchell* are relevant in determining whether the plaintiff and Herald are similarly situated in the case at hand.

The court finds that the plaintiff and Herald are similarly situated as to three of the *Mitchell* factors. The plaintiff and Herald were both trainmen in the same division and the same

department and subject to the same disciplinary committee. (Docket No. 31, Harden Depos. at p. 11; Docket No. 41 at p. 26) They were also subject to the same Disciplinary Policy, and they were disciplined repeatedly for the same problems of excessive absenteeism. (Docket No. 31, Harden Depos., Exhibit 9, Special Board of Adjustment No. 955; Docket No. 41 at p. 34) Therefore, the only remaining issue is whether they engaged in the same conduct of comparable seriousness without differentiating or mitigating circumstances.

The defendant argues that the conduct is not of comparable seriousness because the plaintiff's absentee problems stemmed from the fact that he worked another job, abused the FMLA to miss work at CSXT for his second job, and suffered two injuries at that second job that caused him to miss work at CSXT. (Docket No. 42, CSXT's Reply to Plaintiff's Memorandum in Opposition to the Motion for Summary Judgment at p. 3) However, these were not the reasons for which the plaintiff was terminated and, therefore, they are not relevant as potential differences in their employment situation. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (holding that, in examining an adverse employment action for possible discrimination, the court should look to "whether the employer can establish its 'reasonable reliance' on the particularized facts that were before it *at the time the decision was made*.") (emphasis added); *see also Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1996) (requiring only that the employer reasonably rely on the particular facts before it in making its decision).

The defendant knew that the plaintiff had a second, full time job at the time it terminated him. (Docket No. 31, Harden Depos., Exhibit 7, Public Law Board No. 6398) However, defendant's employment policies do not prohibit employees from having another job. (Docket No. 41 at p. 56) Rule 500 states, in pertinent part, that employees may not engage in other work "that interferes with their proper rest or performance of their railroad duties." (Docket No. 31,

Harden Depos., Exhibit 4, CSXT Operating Rules)  Therefore, it is not the plaintiff's having a second job, but rather the alleged interference resulting from that job with which the defendant had a problem.  While the defendant alleges that the plaintiff violated Rule 500, the record shows that Herald did as well.  (Docket No. 34, Merrell Affidavit at ¶ 3; Docket No. 41 at p. 34)  Given that the plaintiff was allowed to have a second job as long as he did not violate the provisions of Rule 500 and that Herald also violated Rule 500, albeit in a different respect, the second job, in and of itself, is not a sufficiently differentiating circumstance to defeat the establishment of the *prima facie* case.

In addition, the defendant did not know the hours or the days that the plaintiff worked at Southwest at the time it terminated him or that he had injured himself while working for Southwest.  The records of the plaintiff's employment at Southwest that the defendant cites were obtained during discovery.  (Docket No. 32, CSXT's Memorandum in Support of its Motion for Summary Judgment at p. 8)  The defendant did not have access to the Southwest employment records at the time it made the decision to terminate the plaintiff, and, therefore, defendant's argument that the plaintiff is not similarly situated to Herald based on these records is misplaced.

The defendant next argues that the two employees did not engage in the same conduct of comparable seriousness because the plaintiff's absentee problems were more serious than Herald's.  (Docket No. 42, CSXT's Reply to Plaintiff's Memorandum in Opposition to its Motion for Summary Judgment, at p. 3)

An employee's termination for conduct that might "otherwise warrant termination can be actionable, if the employer's sanctions are applied in a discriminatory manner."  *Montgomery v. Honda of America MFG., Inc.*, No. 01-3199, 2002 WL 31119689, at * 347 (6th Cir. Sept. 24, 2002).  The Sixth Circuit has held that it "is well established that [a plaintiff] may obtain relief

under Title VII, even if he engaged in serious misconduct, provided that white employees who engage in the same conduct were either not disciplined or not disciplined as severely." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002).

In *Harrison v. Metropolitan Government of Nashville and Davidson County, Tenn.*, the Sixth Circuit examined whether the conduct of several non-protected employees was of comparable serious to the plaintiff's conduct, where the plaintiff was terminated after having multiple motor vehicle accidents while working. 80 F.3d 1107, 1116 (6th Cir. 1996). In *Harrison*, the Court noted that the Supreme Court has found, "in comparing employment discipline decisions, 'precise equivalence in culpability between employees' is not required," and, even though the plaintiff had more accidents than two non-protected employees, they were still similarly situated, particularly given the fact that the non-protected employees had other incidents of misconduct on their records as well. *Id*. at 1115-16; *see also Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000) (holding that the plaintiff and alleged comparables were similarly situated because they all had recurring typographical errors, even though the employer argued that the plaintiff in particular was not carrying his weight as a hearing officer); *but cf. Back v. U.S. Postal Service*, No. 99-5294, 2000 WL 353543, at * 5 (6th Cir. Mar. 28, 2000) (holding that two employees were not similarly situated because the non-protected employee "differ[ed] in the number of unscheduled absences and the type of leave taken for his absences … [and] his probation reports indicated adequate performance."); *McDaniel v. Wal-Mart Stores, Inc.*, No. 00-3753, 2002 WL 486067, at * 5 (6th Cir. Mar. 29, 2002) (holding that two employees are not similarly situated for pretext purposes because the plaintiff was fired for "placing store associates, himself and the general public in danger" while pursuing a shoplifter, whereas the non-protected employee did not violate any traffic laws or endanger any bystanders).

Here, both employees were cited for the same violation of the same Disciplinary Policy dealing with "excessive absenteeism." According to a CSXT General Manager, no formal policy exists as to what constitutes excessive absenteeism, but "[*t*]*wenty percent absenteeism is used as a yardstick on the Nashville Division*." (Docket No. 41 at p. 32) During a 103 day period, Herald was absent between 24.6% and 25% of the time. *Id*. at 29. The defendant clearly believed that Herald violated its Disciplinary Policy with that level of absenteeism because it disciplined him for it. *Id*. Therefore, both the plaintiff and Herald were, by the defendant's own definitions, "excessively absent."

It also appears that both employees were at the same level of the Disciplinary Policy when they were found excessively absent. It is not in dispute that the Plaintiff was at Level 5 when he was terminated. (Docket No. 38, Plaintiff's Memorandum Opposing Summary Judgment) Herald had been disciplined with actual suspension two or more times within five years and had committed another offense; therefore, by the defendant's own written Progressive Policy, Herald should have been at Level 5 as well. (Docket No. 38, Employee Performance Policy; Docket No. 41 at p. 21) In fact, at Herald's hearing, the Public Law Board stated that, if CSXT had followed its guidelines, Herald would have been terminated the last time he had been formally investigated and found guilty. (Docket No. 41 at p. 34) Thus, in 2002, Herald was also at Level 5.

While the defendant terminated the plaintiff, it gave Herald a thirty-day suspension for his excessive absenteeism. The Public Law Board upheld Herald's suspension, while also noting that the absence record "when taken in conjunction with [Herald's] egregiously deplorable disciplinary record, supports [CSXT's] position that the discipline assessed was not only

warranted but *extremely lenient*." *Id.* at 37. (emphasis added) Herald's thirty-day suspension was later reduced to an actual suspension of ten days. *Id.* at p. 25.

The fact that the plaintiff, in the period leading up to his termination, was absent much more than Herald was in the period leading up to his 30-day (later reduced to 10-day) suspension weighs in favor of the defendant.[9] However, the similarities between the two employees abound. Both the plaintiff and Herald violated the same Attendance Policy while at the same level of that policy and while working in the same position and for the same department at CSXT. In addition, both were over the threshold of the informal twenty percent absenteeism rate and, thus, both fit the defendant's own definition of "excessive absenteeism." Both were disciplined at Level 5 for excessive absenteeism and Rule 500 violations, but, while the plaintiff was terminated, Herald received only ten days of actual suspension after the reduction from the original thirty-day suspension. Given that the evidence in the record supports both sides, the court finds that there are several genuine issues of material fact as to whether the plaintiff and Herald were similarly situated.

The defendant contends that, even assuming plaintiff can establish the similarly situated component, there is no evidence that CSXT treated Steve Herald more favorably than it treated the plaintiff. (Docket No. 32, p. 14) According to the defendant, because there is no proof that the defendant treated Steve Herald with more leniency than the plaintiff, the plaintiff was not treated less favorably in any respect. *Id.* CSXT claims that it actually showed the plaintiff more

---

[9] The "total available time" in a normal work week is 148 hours. (Docket No. 32, CSXT Memorandum in Support of its Motion for Summary Judgment at p. 5 n.2) An employee assigned to a regular five-day yard job, as the plaintiff was for all but 15 days of the relevant time period, will work for approximately 24% of the total time, or 35.52 hours per week. (Docket No. 31, Harden Depos., Exhibit 9, p. 19 n.9) During the time period under investigation, the Plaintiff worked 174.5 hours for CSXT, including: 48.75 hours from January 19 to January 31, 45.4 hours in February, 44.35 hours in March, 22.1 hours in April and 13.9 hours from May 1 to May 6. (Docket No. 39, Plaintiff's Response to Defendant's Concise Statement of Undisputed Material Facts ¶ 12) This number of hours over a fifteen-week period means that the plaintiff worked for about 7.8% of the total available time. (Docket No. 31, Harden Depos., Exhibit 9, p. 19)

leniency, because, in 1999, it allowed the plaintiff to remain at the first level, even though it was his second offense, and because, in 2002, it voluntarily rescinded the plaintiff's termination after the plaintiff claimed he did not receive adequate notice of the hearing. *Id*. at 14-15.

However, the less favorable treatment at issue in this case is the fact that the plaintiff was terminated for violations of the Attendance Policy while at Level 5, while a similarly situated employee, Steve Herald, was not terminated for the same violation at the same level. The Attendance Policy states that, when an employee has been disciplined with actual suspension more than two times within the past five years and then commits another offense, the "discipline administered should be dismissal." (Docket 41 at p. 19) Both the plaintiff and Herald fell into this category, but only the plaintiff was terminated.

Drawing all the reasonable inferences and viewing the evidence in the light most favorable to the plaintiff, the court finds that there is a genuine issue of material fact as to whether a similarly situated, non-protected employee – namely, Herald – was treated more favorably than the plaintiff. Accordingly, the plaintiff has, for purposes of summary judgment, established a prima facie case of race discrimination.

### C. **Legitimate, Non-Discriminatory Reason**

Once the plaintiff has established a *prima facie* case, the burden of producing a legitimate, non-discriminatory reason for the adverse employment action falls onto the employer. *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir. 1997). The defendant easily meets this burden of production through its assertion that the plaintiff was terminated for his excessive absenteeism and violation of Rule 500.[10] (Docket No. 34, Merrell Affidavit at ¶ 3; Docket No. 32, Defendant's Motion in Support of Summary Judgment, pg. 15) The proffered reason is

---

[10] The plaintiff does not dispute that this is a legitimate, non-discriminatory reason. (Docket No. 38, Plaintiff's Memorandum in Opposition to Summary Judgment)

sufficient to shift the burden back to the plaintiff to establish a genuine issue of material fact that the employer's explanation was pretextual.

      D.    **Pretext**

To show pretext the "plaintiff must produce sufficient evidence from which the jury could 'reasonably reject [the defendants'] explanation' and infer that the defendants intentionally discriminated against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). To make out a case that the employer's non-discriminatory explanation is not credible, the plaintiff must show either "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis in original).

      1.    <u>The Proffered Reasons had no Basis in Fact</u>

With respect to the first possible method of showing pretext, the plaintiff argues that, because he never actually missed a call and had legitimate reasons for being absent on the days that he was cited for excessive absenteeism, including the fact that he was on FMLA leave and used his vacation days as well as bereavement leave, the defendant's reasons for his termination have no basis in fact. (Docket No. 38, pp. 8-9)

Showing that an employer's legitimate, non-discriminatory reason has no basis in fact requires evidence that the proffered bases for the discharge did not actually happen; that they are "factually false." *Manzer*, 29 F.3d at 1084; *see McDaniel v. Wal-Mart Stores, Inc.*, No. 00-3753, 2002 WL 486067, at * 5 (6th Cir. Mar. 29, 2002) ("The first type of showing consists of evidence that the facts asserted by the employer simply did not happen."). The Sixth Circuit has held that pretext, under the "no basis in fact" method, "cannot be shown by attacking the

decision itself." *Hein v. All America Plywood Co.*, 232 F.3d 482, 490 (6th Cir. 2000); *see also Wofford v. Middletown Tube Works, Inc.*, 67 Fed.Appx. 312, 317 (6th Cir. 2003) (finding it enough to defeat the "no basis in fact" showing of pretext that the employer did not know that the plaintiff's girlfriend called in his absence, because the employer believed it had a legitimate non-discriminatory reason for firing the plaintiff). Therefore, the plaintiff has to do more than simply dispute the facts upon which his discharge was based. *Id.* Rather, he has to put forth evidence that demonstrates the employer did not "honestly believe" in that legitimate, non-discriminatory reason. *Id.* at 494.

Here, the plaintiff does not dispute that he worked for the defendant for only 174.5 hours between January 19, 2002 and May 6, 2002. (Docket No. 39, Plaintiff's Response to Defendant's Concise Statement of Material Facts at ¶ 12) It is also undisputed that CSXT has a policy for dealing with "Attendance Incidents including missing work without permission, frequent layoffs, missed calls, etc." (Docket No. 31, Harden Depos., Exhibit 5, CSXT Employee Policy Guidelines) The fact that the plaintiff may have had legitimate reasons for his absence appears irrelevant under the express terms of the Attendance Policy. The title of the policy lists "frequent layoffs," which gives the impression that it is the frequency, not the legitimacy of the missed days on which the employer is focused for that particular infraction. In comparison, only one day of missed work without permission would be necessary under the policy to warrant disciplinary action. In addition, when the plaintiff appealed his Level 4 suspension the Public Law Board held that fact that he "marked off with the callers does not alleviate or mitigate the excessive absenteeism." (Docket No. 34, Exhibit A, Public Law Board No. 5983)

Proving that the employer's non-discriminatory reason is pretextual because it has no basis in fact relies on a showing that the expressed reason did not actually exist and that the

employer knew that to be the case. The plaintiff has failed to raise a genuine issue of material fact in this regard.

> 2. The Proffered Reasons Were Insufficient to Motivate the Employer's Actions

The plaintiff points to the same evidence for both the second and third showing of pretext – the defendant's treatment of Herald in comparison to its treatment of the plaintiff. (Docket No. 38 at p. 9) The third showing of pretext, that the proffered reasons were insufficient to motivate the employer's actions, is, like the first showing, easily recognizable. *Manzer*, 29 F.3d at 1084. Under this showing, the plaintiff will ordinarily offer evidence that other employees, particularly those not in the protected class, "were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id*. The Sixth Circuit has applied the *Ercegovich* standard of establishing whether employees are similarity situated within the context of a *prima facie* case, to determine whether employees are engaged in "substantially identical conduct" for the purpose of showing that the reasons were insufficient to motivate the employer's actions and were, therefore, pretextual. *Weigel v. Baptist Hospital of East Tenn.*, 302 F.3d 367, 379 (6th Cir. 2002) (citing *Ercegovich v. Goodyear Tire & Rubber Co*. 154 F.3d 344 (6th Cir. 1998)). In *Weigel*, the Court found that two employees were not similar in all of the relevant aspects, as required in *Ercegovich*, and that, as a result, the plaintiff had failed to show pretext under the "insufficient to motivate" prong. *Id*. at 380. Given this standard, it may be enough for the third showing of pretext to rely on the evidence that the plaintiff and Herald are similarly situated, which was used to make out the *prima facie* case. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004) ("The evidence of pretext may include, however, the same evidence offered initially to establish the *prima facie* case); *Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 124 (2nd Cir. 2004) ("To

meet his or her ultimate burden, the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her *prima facie* case, without more."); *Lowe v. City of Monrovia*, 775 F.2d 998, 1008 (9th Cir. 1985) (holding that, to show pretext, the plaintiff does not necessarily have to offer evidence beyond that offered to establish the *prima facie* case).

To prove his *prima facie* case, the plaintiff offered Steve Herald as a similarly situated employee who was not terminated for the same alleged "excessive absenteeism," despite the fact that he was found guilty of excessive absenteeism while at Level 5 of the Disciplinary Policy. As stated above, this may be enough by itself to establish the third possible showing of pretext. However, Plaintiff offers additional evidence which may support a finding that the defendant's reasons were pretextual. The plaintiff may point to the respective treatments of himself and Herald at earlier stages of the Discipline Policy as circumstances that tend to show it is more likely that the employer acted in a discriminatory way. For example, the plaintiff was held at Level One in 1999, but, with that exception, proceeded straight through the levels, each time receiving the maximum discipline. (Docket No. 34, Merrell Affidavit ¶¶ 4-8) Herald, on the other hand, received multiple ten-and thirty-day suspensions, one of which was reduced to ten days, without progressing to termination. (Docket No. 41 at p. 34) The plaintiff's first recorded attendance problem was in 1999 (Docket No. 34, Merrell Affidavit at ¶ 4), whereas Herald was first disciplined for an attendance issue in 1979 (Docket No. 41 at p. 21). Finally, when a mechanical malfunction prevented the tape of Herald's hearing from being authenticated, his thirty-day suspension was rescinded. *Id*. at 23. The defendant did not hold another hearing into Herald's attendance problems for that time period, instead waiting until Herald's problems had continued for another two-month period and charging him with excessive absenteeism only for that period. *Id*. at 26. Similarly, the defendant rescinded the plaintiff's first termination for

excessive absenteeism after the union appealed because the hearing occurred without the plaintiff present due to insufficient notice. (Docket No. 31, Harden Depos., Exhibit 9, Special Board of Adjustment No. 955) However, in the plaintiff's case, the defendant waited three weeks before it notified the plaintiff of another formal hearing into virtually the same period of time as was at issue in the first hearing. *Id*.

Moreover, the Sixth Circuit has held, along with several other circuits, that "evidence of pretext may consist of a defendant's changing of explanations." *Cichewicz v. Unova Industrial Automotive Systems, Inc.*, No. 02-1831, 2004 WL 291178 (6th Cir. Feb. 12, 2004); *see also Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 526 (11th Cir. 1994) ("[I]dentification of inconsistencies in the defendant's testimony is evidence of pretext."); *EEOC v. Ethan Allen*, 44 F.3d 116, 120 (2d Cir. 1994) (holding that pretext can be found in discrepancies in a defendant's explanations).

Here, the defendant consistently told the plaintiff that the reason he was being disciplined was "excessive absenteeism." *See* (Docket No. 31, Harden Depos., Exhibit 5, CSXT Employee Performance Policy Guidelines) ("The investigation clearly developed that you were excessively absent during the period …"); (Docket No. 41 at p. 8) ("The purpose of this investigation is to determine the facts and place your responsibility, if any, in connection with your excessive absenteeism …"); (Docket No. 41 at p. 15) ("in connection with your excessive absenteeism for the period of 1/19/02 to 5/6/02."). However, the defendant now asserts that plaintiff was terminated due to, "excessive absenteeism and violation of CSXT's Operating Rule 500." (Docket No. 34, Merrell Affidavit at ¶ 3) In the Defendant's Concise Statement of Undisputed Material Facts it asserts that the plaintiff was terminated because he "was excessively absent … due *in large part* to his violation of Rule 500." (Docket No. 33 ¶ 8) (emphasis added) In the

defendant's Memorandum in Support of Summary Judgment, it states that the legitimate non-discriminatory reason is his, "excessive absenteeism and his repeated violation of Rule 500." (Docket No. 32 at 15)  The defendant also relies heavily on the plaintiff's Southwest employment records which were not obtained until after the plaintiff's dismissal.  (Docket No. 42, CSXT's Reply to Plaintiff's Memorandum Opposing Summary Judgment at p. 3)

While these explanations are not necessarily inconsistent, the defendant's shifting focus is evident.  This evidence, along with the evidence in support of the prima facie case, creates a genuine issue of material fact with respect to the element of pretext.

3.      **Conclusion**

In conclusion, there is sufficient factual evidence, when viewed in the light most favorable to the plaintiff, on which to base a finding of pretext under the third *Manzer* method.[11] 29 F.3d at 1084.  There is a genuine issue of material fact as to whether the defendant's stated non-discriminatory reason for terminating the plaintiff was pretextual.

III.      <u>**Conclusion**</u>

For the reasons stated herein, the defendant's motion for summary judgment will be denied. An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[11] Because the court finds sufficient evidence to present a genuine issue of material fact as to the third *Manzer* method, the court finds that it is unnecessary to discuss the second, more difficult to establish, method of finding pretext.

Case 3:03-cv-01164   Document 44   Filed 07/14/05   Page 27 of 27 PageID #: 28